**WINGFIELD v. SMITH.　(No. 8126.)**

(Court of Civil Appeals of Texas.　Galveston. Feb. 28, 1922.　Rehearing Denied March 23, 1922.)

1. **Appeal and error ⬅1012(2)—Finding not set aside because against mere preponderance of evidence.**

Where there is any testimony to support a finding of the trial court, it will not be set aside because contrary to a mere preponderance of the evidence unless prejudice or bias or other improper motive is shown.

2. **Trespass to try title ⬅41(1) — Judgment for defendant held not against preponderance of evidence.**

In trespass to try title, a judgment for defendant held not against the great weight and preponderance of the evidence.

Appeal from District Court, Anderson County; W. R. Bishop, Judge.

Suit in trespass to try title by H. Wingfield against W. R. Smith. Judgment for defendant, and plaintiff appeals. Affirmed.

J. W. Stitt, of Fort Worth, for appellant. Campbell & Sewell and Swift & Cotten, all of Palestine, for appellee.

LANE, J.　This is a suit in trespass to try title to 20⅙ acres of land situated in Anderson county, Tex., brought by appellant, H. Wingfield, against appellee, W. R. Smith. The substance of the plaintiff's allegations

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

is that on the 7th day of September, 1918, the state of Texas patented to him the 20½ acres of land sued for, which he alleged is 86 varas in width and lying between the John Veatch survey on the north and the John Reeves survey on the south; that at the time of said patent the land was unappropriated state land, and by virtue of said patent he was, on the date of the issuance of same, seized and possessed thereof. He then made the necessary and usual allegations as to his forcible ejection by appellee, etc.

The defendant, Smith, answered by plea of not guilty.

The undisputed evidence shows that the defendant, Smith, was the owner of the J. A. Veatch survey, which was surveyed in 1854 and patented on the 10th day of March, 1875, and that the John Reeves survey was awarded by the state of Texas to one J. W. Wingfield on the 2d day of September, 1905. The John Adams league, surveyed in 1836, lies just north of the J. Veatch survey and is the older of the two surveys. The J. Veatch is described as:

"Beginning at an ash 8 inches in diameter on the bank of the Trinity river, same being the S. W. corner of the John Adams league (this corner being further described by referring to a number of bearing trees); thence south with the meanders of the river 586 varas to a post on bank of the river from which a hackberry 10 inches in diameter bears S. 75 deg. W. 7 vrs., an ash 20 inches in diameter bears N. 75 deg. E. 4 vrs.; thence east 1,269 vrs. to the N. W. line of the Simon Sanches league No. 2, a post for corner, from which a hickory bears S. 52 deg. W. 7 vrs.; thence northward; and thence west to place of beginning.

On the 1st day of October, 1859, an old survey was made for Franky Moore, which is described as:

"Beginning at the N. W. corner of the Simon Sanches league on the east bank of the Trinity river; thence N. 55 deg. E., with the Sanches line, 1,340 varas to the S. E. corner of a survey made for Bonner & McDonald by virtue of certificate No. 1908/2009" (not shown to whom it was granted), this corner being described as a "stake from which a hickory bears S. 86 deg. W. 15 vrs., a P. O. bears S. 71 deg. W. 20 vrs.; thence W. with the S. line of the survey made for Bonner & McDonald 1,282 vrs. to S. W. corner of same, from which an ash bears N. 20 deg. W. 12 vrs., a do. bears S. 5 deg. E. 17 vrs.; thence S. with the meanders of the river to place of beginning."

This Franky Moore survey was abandoned, and the John Reeves survey was located on part, if not all, of the same land embraced within the field notes of the Franky Moore. The John Reeves survey, however, is described as:

"Beginning at the N. W. corner of the Simon Sanches league on the east bank of the river; thence N. 55 deg. E. 1,390 vrs. (not 1,340, as in the Moore field notes) to a stake from which a double red oak bears N. 62 W. 15 vrs., same being the S. E. corner of the J. Veatch survey; thence west with the S. line of the J. Veatch survey 1,320 vrs. to the east bank of the Trinity river, from which an ash bears N. 35 E. 25 vrs., same being the S. W. corner of the Veatch survey; thence S. with the Trinity river to the place of beginning."

There is no dispute as to the true location of the north line of the John Reeves survey, and the only controversy is as to whether the south line of the J. Veatch is the same as the north line of the John Reeves survey, as contended by appellee, or whether it is about 86 varas north of the John Reeves north line, as contended by appellant.

It is shown that on the 7th day of September, 1918, the state of Texas, through Gov. W. P. Hobby, issued to appellant, H. Wingfield, a patent to a strip of land 86 varas in width shown by certain field notes made by one S. D. Waldrip, a surveyor, to lie between the J. Veatch and John Reeves surveys. Its north line was taken by the surveyor to be the south line of the J. Veatch survey. In running this line from the river to the Simon Sanches line, Waldrip made it 1,430 varas in length, 161 varas longer than the length of the south line of the Veatch as called for in the Veatch field notes, and 110 varas longer than shown to be the length of the north line of the Reeves.

The defendant, Smith, offered in evidence the deed of date January 22, 1886, by which he became the owner of the J. Veatch survey of 177 acres, and in this deed it is recited that Bonner's ferry was on the Veatch survey.

S. D. Waldrip, who surveyed the strip of land in controversy for plaintiff, H. Wingfield, testified that he had lived in Anderson county for eight years, and that during that time he had been engaged in surveying land in that county; that he was county surveyor for two years, and had been engaged in surveying land since 1890; that he made a survey of the land in controversy and made a plat of the same for the plaintiff, H. Wingfield; that he had located the north line of the old Franky Moore survey and knew where it was; that at its northwest corner he found trees of the same description as those called for in the original field notes of that survey, but none of them bore any marks, however, and he would not say that they were the trees called for in the original field notes; that he ran this line east from the river to the Simon Sanches northwest line and found it to be 1,430 varas in length; that he also found the northwest corner of the John Reeves survey and found the bearing trees called for at that corner; that the length of the north line of the Reeves from the river to the Sanches line is 1,280 varas; that the north line of the Franky Moore and the south line of the J. Veatch is the same,

and that the north line of the Reeves is 86 varas south of this line, which leaves a strip of land between the J. Veatch and Reeves surveys 86 varas in width, and that this is the land in controversy; that none of the bearing trees called for at the southwest corner of the John Adams league in the original or locative field notes of that league could be found, but he thinks he found the south line of the John Adams league, and that it terminates on the bank of the Trinity river about 90 to 100 varas above Bonner's ferry. He concluded, however, by saying that he did not find any line trees along that line, but that he did find some line trees in running the Veatch south line west from where it intersected the Sanches northwest line, and that he also found line trees in the north line of the John Reeves survey.

J. W. Sammons testified that he had been doing practical engineering in Anderson county for 20 years; that he knew the location of the Adams and Veatch surveys and the land involved in this suit; that from his knowledge of the location of the lines of certain old surveys and from information obtained by old maps of these surveys he made a survey of those surveys down there and prepared a plat or map showing the relation of said surveys, one to the other; that the south line of the John Adams league is the north line of the J. Veatch survey, and that the south line of the J. Veatch is the north line of the John Reeves survey; that in making the survey of the Veatch he started at the known northwest corner of the John Reeves survey, and that at this corner he found unmarked trees of the same kind and class as those called for as bearing trees in the original or locative field notes of the J. Veatch survey; that in the original field notes of the Veatch the distance called for from the southwest corner thereof to the Simon Sanches northwest line is 1,269 varas, but that in running the same from the northwest corner of the Reeves, which is also the southwest corner of the Veatch, he found that it intersected the Sanches line at a distance of 1,265 varas; that from the point where the south line of· the Veatch intersected the Sanches line he ran the distance called for in the Veatch field notes northward along the Sanches line to locate the northeast corner of the Veatch; that this point was in the field, and there was nothing there to mark the corner; that from this point he ran west to the east bank of the river; that there was no timber along this line, and hence no marked line; that he knew where Bonner's ferry crossed the river, and that the north line of the Veatch as he located it struck the river close to this ferry, a little south of it; that he measured 586 varas south from the north line of the Veatch, as he located it, and at that point

it intersected the known north line of the John Reeves survey; that the distance between the north and south lines of the Veatch as called for by its field notes was 586 varas; that the distance between the north line of the J. Veatch, as he located it, and the north line of the strip in controversy as fixed by Surveyor Waldrip, is 500 varas. He testified that he had known the location of the Simon Sanches northwest line for 30 years, and that the old maps to which he had access showed the southwest corner of the Adams to be below the ferry.

Jeff Reagan, a surveyor of 30 years' practical experience, testified that he made a recent survey of the J. Veatch survey at the request of Mr. Smith for the purpose of locating its true north and south lines, and that as a result of such survey he found that there could be no vacant land between the Veatch and Reeves surveys, as claimed by the appellant; that in making his survey he first located the south line of the John Adams league by starting from the known corners of certain subdivisions of the Adams and then running south the distance called for in the field notes of such subdivisions as intervened between those points and the south line of the Adams; that, having in this manner located the south line of the Adams some distance from the Trinity river, he ran due west to the river so as to locate the southwest corner of the Adams, and came out right at Bonner's ferry; that none of the bearing trees called for in the Adams field notes at that corner could be located, they were all gone; that from this southwest corner of the Adams, which was the beginning of the J. Veatch, he measured to the known north line of the Reeves and found the distance between said points to be 590 varas.

Appellee, W. R. Smith, in effect, testified that when he bought the Veatch survey in 1886 it was recited in his deed that Bonner's ferry was in the Veatch, but that he was told at the time that the ferry and ferry houses were on the Adams; that the owners of that part of the Adams adjacent to the ferry wrote to him and told him that they did not want to make any trouble for him and proposed to sell him that part of the Adams upon which the ferry houses were situated, and to protect himself he purchased the same.·

That the north line of the old Franky Moore survey and the south line of the Veatch is one and the same is undisputed,· but the contention by appellant is, as before stated, that the north line of the John Reeves survey and the conceded common line between the Veatch and Moore are 86 varas apart, which leaves the land in controversy lying between said lines.

The foregoing is a statement of practically all the evidence bearing on the question

of the true location of the several boundary lines in dispute.

The cause was tried before the court without a jury, and judgment was rendered in favor of appellee, W. R. Smith, for the land in controversy. From this judgment H. Wingfield has appealed.

[1, 2] At the request of appellant the court filed his findings of fact and conclusions of law, which were as follows:

"Facts.

"I find that the S. B. line of the Veatch survey is the N. B. line of the John Reeves survey, as called for in the field notes of the said Reeves survey, and that the land in controversy is on the Veatch survey, which was patented by the state of Texas to John A. Veatch long prior to the issuance of the patent to H. Wingfield."

"Conclusions of Law.

"I find that the patent to H. Wingfield conveyed no title, as the land described therein had theretofore been patented by the state of Texas to John A. Veatch." .

The effect of appellant's contention is that the findings of fact and judgment of the trial court are so against the great weight and preponderance of the evidence as to be clearly wrong, and for this reason the judgment rendered should be reversed.

We are not prepared to agree with the contention of appellant. It may be that, had the cause been submitted to us as trial judges, upon the evidence adduced, we would have reached a conclusion different from that reached by the trial judge, but, if this were true, still we are not at liberty to substitute our findings upon conflicting evidence for the findings of the trial court. Where there is testimony to support a finding of the trial court, as we think there was in the present case, it will not be set aside because contrary, in the opinion of the appellate court, to a mere preponderance of the evidence, but to warrant such action the evidence must be so overwhelmingly against the finding of the trial court as to suggest prejudice or bias or other improper motive on the part of the trial judge. Traction Co. v. Arnold (Tex. Civ. App.) 211 S. W. 275; Deaton v. Hamilton County (Tex. Civ. App.) 220 S. W. 577; Hightower v. Hightower (Tex. Civ. App.) 236 S. W. 197, and authorities therein cited.

There is evidence strongly tending to support the court's finding that the south line of the Veatch and the north line of the Reeves was the same line. It was shown that the length of the south boundary line of the Veatch, running from the bank of the river east to the Sanches line, as called for in its original or locative field notes, was 1,269 varas, and that the south line of said survey, as made by appellant's witness Waldrip, was 1,430 varas in length, a difference of 161 varas, while the survey made by appellee's witness Sammons shows that the agreed north line of the Reeves was 1,265 varas in length. There is evidence tending to show that, if there is any difference in the north lines of the old Franky Moore and the John Reeves survey, the John Reeves was further north than the Moore, as the locative field notes of the Reeves call to begin at the northwest corner of the Simon Sanches and to run thence north 55° E. 1,390 varas with the said Sanches line for its most northern and eastern corner, and the original field notes —in fact, the only field notes—of the Moore call to begin at the northwest corner of the Sanches and to run with the northwest line of the same N. 55° E. 1,340 varas, 50 varas short of the distance called for by the Reeves field notes. Therefore the contention of appellant that the John Reeves north line was 86 varas south of said division line between the Veatch and Moore is hardly tenable. We attach but little importance to the recital in the deed by which appellee acquired title to the Veatch survey that Bonner's ferry was on the Veatch. The evidence offered to establish the location of Bonner's ferry with relation to the true north line of the Veatch is contradictory.

It is unnecessary to pursue this discussion further. We have reached the conclusion that there was evidence to support the judgment rendered, and it therefore becomes our duty to affirm it; and it is so ordered.

Affirmed.